**ZENITH/KREMER WASTE SYSTEMS, INC., et. al., Respondents,**

v.

**WESTERN LAKE SUPERIOR SANITARY DISTRICT, petitioner, Appellant.**

No. C0–96–1602.

Supreme Court of Minnesota.

Dec. 24, 1997.

Briggs and Morgan, P.A., Timothy R. Thornton, Jack Y. Perry, Minneapolis, for appellant

Fryberger, Buchanan, Smith & Frederick, P.A., Harold A. Frederick, Duluth, for respondents.

State of Minnesota, Office of Atty. Gen., Beverly Conerton, St. Paul, Lockridge, Grindal, Nauen & Holstein, P.L.L.P., Charles N. Nauen, William A. Grengler, Susan E. Ellingstad, Minneapolis, for amicus curiae.

## OPINION

KEITH, Chief Justice.

This case involves a Dormant Commerce Clause challenge to a municipality's use of a tax and subsidy arrangement to pay the debt service on its solid waste processing facility and to lower the facility's tipping fees. In the district court, the respondents, Zenith/Kremer Waste Systems, Inc. (Zenith/Kremer) and United Waste Systems, Inc. (United), challenged both the authority of the appellant, Western Lake Superior Sanitary District (WLSSD), to charge a waste management tax and the constitutionality of the tax. The district court granted appellant partial summary judgment on the issue of its statutory authority to charge a reasonable waste management tax and partial summary judgment to the respondents on their Dormant Commerce Clause challenge, finding that the tax and subsidy scheme has a discriminatory effect on interstate commerce. The court then ordered that waste management taxes collected by the respondents be held in a segregated account pending disposition in a separate, federal case involving the parties. The court of appeals affirmed the district court's finding of discriminatory effect, *Zenith/Kremer Waste Systems, Inc. v. Western Lake Superior Sanitary District*, 558 N.W.2d 288, 294 (Minn.App.1997), and we granted WLSSD's petition for further review.[1] Because we conclude that WLSSD's tax and subsidy ar-

1. The State of Minnesota, by its Attorney General and by the Acting Director of its Office of Environmental Assistance (OEA), moved this court to serve and file a brief as amicus curiae and was granted permission. Respondents have moved to strike that portion of the brief containing the affidavit of Arthur E. Dunn, Acting Director of the OEA, and any references to the affidavit within the briefs. Respondents assert that the affidavit constitutes information outside the record on appeal. Because the challenged affidavit and references to it in the briefs were not considered on appeal, we need not address or decide the motion.

rangement does not impose any differential burden on out-of-state commerce and does not have a discriminatory purpose, we hold that it does not discriminate against interstate commerce. Rather, we hold that it imposes only a minor, incidental burden on interstate commerce which is far outweighed by the benefits to the municipality. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I.

WLSSD is a limited purpose political subdivision with responsibility for regulating the collection, treatment, and disposal of sewage and solid waste within a 500–square mile territory in northeastern Minnesota. WLSSD owns and operates a waste processing facility near Duluth, Minnesota which utilizes solid waste as fuel to incinerate the sludge by-product of waste-water processing. Until March 1996, WLSSD charged a single tipping fee at the facility to cover the cost of running and financing the facility, as well as the cost of a variety of hazardous waste and recycling programs. To ensure a steady stream of solid waste for the facility, WLSSD adopted a waste designation ordinance requiring all persons who generate solid waste in the district to dispose of it at the facility. The respondents challenged this regulation and the federal district court found it to be unconstitutional. *Zenith/Kremer Waste Sys., Inc. v. Western Lake Superior Sanitary Dist.*, No. 5–95–228, 1996 WL 612465 (D.Minn. Oct.10, 1996).

Respondent Zenith/Kremer collects, hauls, and deposits 40–50% of the solid waste generated within the district. Respondent United, which purchased Zenith/Kremer in September 1995, performs waste collection and hauling services and owns a landfill in Ontonagon County, Michigan. In the fall of 1995, respondents informed WLSSD that they would begin disposing of the district waste collected by Zenith at the Ontonagon landfill

unless WLSSD reduced its tipping fee at its facility. At that time, WLSSD charged a tipping fee of $63 per ton. The fee at the Ontonagon landfill was approximately $40–45 per ton.[2]

Following commencement of the lawsuit challenging its waste designation ordinance, WLSSD began considering alternative means of financing its solid waste services and, in November 1995, published the following options: 1) impose the full cost of all waste management programs on the tipping fee; 2) reduce its tipping fee to $55–60 per ton and add a "small ad valorem levy" to make up the lost revenues; or 3) reduce the tipping fee to $39.75 per ton and impose a service charge to make up for the lost revenues. Under Minn. Stat. § 400.08, subd. 2 (1996), the WLSSD is authorized to finance solid waste management services through service charges, a tax on all property within its jurisdiction, or a combination of charges and taxes.[3] Minnesota Statutes § 400.08, subd. 3 specifically permits WLSSD to include in the charges the payment of principal and interest on monies borrowed by the county for the acquisition or betterment of facilities.

After public hearings, WLSSD adopted a reduced tipping fee of $39.75 and a waste management tax of $28.25 per ton, effective March 1, 1996. The waste management tax is assessed on all property owners, lessees, and occupants within the waste district (waste generators) based on the amount of solid waste they generate. The amount of solid waste is calculated according to the volume of the waste generator's waste container. The management tax is collected from the waste generators by the trash haulers and remitted to WLSSD, minus a 4% administrative fee for the haulers.

At least 25% of the solid waste management tax, or $7 per ton, subsidizes the debt service and expenses of the waste processing facility resulting from improvements to the facility. Zenith/Kremer and United claim

---

**2.** There is some dispute over the tipping fee at Ontonagon landfill. In a letter dated October 25, 1995, Zenith/Kremer informed its customers that it had located a landfill charging a tipping fee of $30 per ton. It is disputed whether this landfill was, in fact, Ontonagon. However, this dispute is not material to a determination of whether

WLSSD's waste management tax scheme is discriminatory.

**3.** Minnesota Statutes § 400.08, which refers to the authority of counties, is made applicable to the WLSSD under Minn.Stat. § 115A.554 (1996).

that the true amount of the subsidy is over 62% of the tax. The remainder of the tax finances WLSSD's household hazardous waste program and facility, yard composting facility, waste education programs, mercury pollution reduction program, Community Cleanup Days, improvements and closure costs of Rice Lake landfill, and other recycling activities.

## II.

 Article I, section 8, clause 3 of the United States Constitution, which invests Congress with the power "[t]o regulate Commerce among the several States," has long been understood to contain a self-enacting "dormant" aspect that limits the power of states to discriminate against or burden the flow of interstate commerce. *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality of Oregon*, 511 U.S. 93, 98, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). The first step of a Dormant Commerce Clause analysis is to determine whether the law discriminates against interstate commerce or whether it regulates evenhandedly, with only incidental effects on interstate commerce. *Id.* at 99, 114 S.Ct. at 1350. Discrimination under the Dormant Commerce Clause means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* The discrimination may be explicit on the face of the law or contained within the law's effect or purpose. *See Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986); *Hunt v. Washington State Apple Advertising Comm'n.*, 432 U.S. 333, 350–3, 97 S.Ct. 2434, 2445–6, 53 L.Ed.2d 383 (1977). In analyzing discrimination in waste management cases, the article of commerce to be examined "is not so much the solid waste itself, but rather the service of processing and disposing of it." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399 (1994).

 The lower courts found that WLSSD's tax scheme is discriminatory because it allows the WLSSD facility to win business away from out-of-state waste processors with its subsidized tipping fee. However, any subsidy will necessarily confer an economic advantage on the industry being subsidized and a long line of Supreme Court cases, most recently *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, — U.S. —, — n. 16, —, 117 S.Ct. 1590, 1601 n. 16, 1605, 137 L.Ed.2d 852 (1997), have suggested that subsidies are a constitutional means of supporting state interests. The Supreme Court explained in *New Energy Co. of Indiana v. Limbach*, that a subsidy may be "no less discriminatory" than a tax credit, but "[t]he Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description in connection with the State's regulation of interstate commerce." 486 U.S. 269, 278, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302 (1988).

A key point of contention is the permissible source of the subsidy. In *C & A Carbone, Inc.*, 511 U.S. at 394, 114 S.Ct. at 1684, the Court suggested that the town could subsidize a privately-owned trash facility "through general taxes or municipal bonds" as an alternative to discriminatory waste designation laws. WLSSD asserts that its management tax is a "general tax" approved by *Carbone*. It relies on the interpretation of the Second Circuit Court of Appeals in *USA Recycling v. Town of Babylon*, 66 F.3d 1272, 1285 & n. 12 (2d Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996), that general taxes are non-discriminatory taxes which are applied evenhandedly to in-state and out-of-state businesses. WLSSD argues that its management tax is applied evenhandedly to all waste generators in the district, irrespective of the nature of the generator's business. Furthermore, WLSSD posits that the tax is the equivalent of a general tax because it is used to fund a range of competing, non-protectionist purposes: the household hazardous waste program, yard waste composting, waste education, mercury pollution reduction, Community Clean-up Days, environmental improvements at the local landfill, and recycling.

Respondents Zenith/Kremer and United oppose this characterization of the waste generation tax. They rely on *West Lynn Creamery Inc. v. Healy*, 512 U.S. 186, 114

S.Ct. 2205, 129 L.Ed.2d 157 (1994) for the proposition that the source of the subsidy must be the general revenue, rather than a segregated fund, because, "A State is less likely to maintain a subsidy when its citizens perceive that the money (in the general fund) is available for any number of competing, non-protectionist, purposes." *West Lynn,* 512 U.S. at 211–12, 114 S.Ct. at 2221 (Scalia, J. concurring) Respondents point to Minn. Stat. § 400.08, subd. 2, limiting the use of the tax to "solid waste management services," to show that the tax is not available for competing purposes and therefore, is not a general revenue tax. In addition, the respondents argue that the tax is not a general revenue tax because it is calculated on the volume of trash produced and because a portion of it is specifically earmarked for debt service on the waste facility.

Because the Supreme Court has not addressed the issue of subsidies directly, we are not convinced that the source of revenue for a constitutionally permissible subsidy must be "general taxes."[4] However, we agree with the WLSSD that the waste management tax qualifies as a "general tax" within the meaning of *Carbone.* The tax is nondiscriminatory, being applied to essentially all of the occupants, property owners, and residents of the district. Moreover, this broad application of the tax and the fact that the revenue is available for competing recycling and waste projects provides an important political check on the use of the tax to subsidize the waste processing facility. It is irrelevant to the characterization of the tax that it is based upon the volume of trash produced. *See Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 621, 101 S.Ct. 2946, 2955, 69 L.Ed.2d 884 (1981) (holding that a severance tax imposed on amount of coal mined was a "general revenue tax"). Additionally, the characterization of the tax is not altered simply because it is earmarked for a particular project. *See, e.g., Individuals for Responsible Government, Inc. v. Washoe County,* 110 F.3d 699, 704 (9th Cir.1997) (flat recycling fee paid by all residents "is essentially equivalent to a general property tax

targeted to fund a specific county-wide service").

Finding that the tax supporting the subsidy to the WLSSD facility qualifies as a "general tax" does not end the analysis, however. The Supreme Court has stated that the tax and subsidy must be considered together to determine the aggregate effect of the scheme on interstate commerce. *West Lynn Creamery Inc.,* 512 U.S. at 201, 114 S.Ct. at 2215. In *West Lynn,* the Court considered the constitutionality of a tax and subsidy scheme in which Massachusetts taxed all milk sold in the state by dealers and distributed the funds solely to in-state milk producers. *Id.* at 188, 114 S.Ct. at 2209. The Court noted that, although the tax was levied against all milk dealers evenhandedly, two-thirds of the milk taxed was produced out-of-state. *Id.* When the Court analyzed the tax together with the subsidy, it found that the tax acted like a tariff imposed only on out-of-state products because any burden on in-state interests was mitigated by the subsidy. *Id.* at 194–95, 114 S.Ct. at 2212.

WLSSD distinguishes the tax in *West Lynn* as a tariff on milk primarily produced out-of-state, while its own tax is a local tax applied solely to trash produced within the district. WLSSD also distinguishes *West Lynn* on the basis of the recipients of the subsidy. In *West Lynn,* the subsidy was provided exclusively to in-state producers of milk, while WLSSD offers its reduced tipping tax to anyone who uses the facility. Thus, WLSSD asserts that its tax scheme burdens only in-state interests and benefits both in-state and out-of-state interests.

Another fundamental distinction presented by WLSSD is that its tax scheme subsidizes a publicly owned facility, whereas the interests subsidized in *West Lynn* were Massachusetts farmers. WLSSD argues that waste management is "the quintessential responsibility of the local government" and, because of this, government can require citizens to pay for the services irrespective of whether they actually use them. Additional-

---

4. In Justice O'Connor's concurring opinion in *Carbone,* she referred simply to "taxes" as a suggested source of subsidy. *Id.* at 406, 114 S.Ct. at 1690. Thus, there has not been a uniform insistence upon "general taxes" in the Supreme Court's opinions.

ly, WLSSD claims that the waste management tax benefits all waste generators in the district, irrespective of whether they use the WLSSD waste facility, by ensuring that a legislatively preferred waste disposal method will always be available to them and by providing the intangible benefits of an enhanced awareness of the need to conserve resources.

Zenith/Kremer and United assert that it is of no particular constitutional moment that the waste management tax is imposed locally on the waste generators, rather than waste haulers. They rely upon the Court's statement in *West Lynn* that "[T]he imposition of a differential burden on any part of the stream of commerce—from wholesaler to retailer to consumer—is invalid because a burden placed at any point will result in a disadvantage to the out-of-state producer." *West Lynn*, 512 U.S. at 202, 114 S.Ct. at 2216. The respondents argue that, as in *West Lynn*, the true burden of the tax and subsidy scheme is on the out-of-state interests which, in this case, are the out-of-state waste processors. Respondents contend that out-of-state waste processors lose their competitive advantage because their in-district users must pay the WLSSD's waste management tax in addition to the out-of-state tipping fees and do not receive any benefit from the subsidy. However, users of the WLSSD facility are insulated from the effects of the tax because the subsidy allows WLSSD to lower tipping fees at its facility. Respondents assert that the Supreme Court forbade this type of tax and subsidy arrangement in *West Lynn* when it stated, "when a nondiscriminatory tax is coupled with a subsidy to one of the groups hurt by the tax, a State's political processes can no longer be relied upon to prevent legislative abuse, because one of the in-state interests which would otherwise lobby against the tax has been mollified by the subsidy." *Id.* at 200, 114 S.Ct. at 2214.

We agree with WLSSD, however, that *West Lynn* is inapposite. It is constitutionally significant that the waste management tax is levied on residents and occupants of the district rather than upon the waste haulers because it demonstrates that the focus, purpose, and reach of the tax is entirely local.

Furthermore, while we recognize that discrimination may occur at many different levels of commerce, we do not believe that the tax in this case imposes any differential burden on out-of-state commerce. The use of the waste generation taxes to pay the debt service on a government owned facility, which benefits users of the facility indirectly through lowered tipping fees, is a far cry from the direct cash subsidy found in *West Lynn*. As the second circuit found in *USA Recycling*, "If anyone is 'subsidized' by the user fees, it is the municipal treasury—not any private business. And that, of course, is the point of every tax." 66 F.3d at 1292. Like schools and parks, the waste facility is a municipal service that the government has the right to finance through public fees and taxes, irrespective of whether there may be competing, out-of-state providers. Additionally, unlike *West Lynn*, the waste generators and in-state waste haulers adversely affected by WLSSD's waste management tax had the opportunity to participate in the political process under which the tax was determined. This process includes the legislative debate through which the enabling legislation was created and the public hearings held by WLSSD.

Next, we consider the lower courts' intimations that WLSSD's tax scheme has a discriminatory purpose. Both the district court and the court of appeals regarded the fact that the new tax and subsidy scheme was adopted shortly after the respondents challenged WLSSD's waste designation scheme and announced that their plan to use their Michigan landfill as persuasive evidence of a discriminatory purpose. The court of appeals also noted, as evidence of a discriminatory purpose, the fact that the tax scheme results in virtually no change in the net revenues garnered by WLSSD.

We hold that there is no discriminatory purpose underlying the waste management tax scheme. The tax scheme was adopted to ensure the financial survival of the waste facility while maintaining a volume based system to encourage waste reduction. These purposes are endorsed by the state legisla-

ture in Minn.Stat. § 115A.02 (1996).[5] Furthermore, the Supreme Court has recognized the legitimacy of a state's desire to aid its industries through its repeated suggestion that subsidies are a permissible means. The fact that the total amount of revenue garnered from the new tax system is almost identical to the amount obtained under the single fee simply underscores WLSSD's purpose in obtaining necessary revenue for the facility, rather than a desire to discriminate against interstate commerce.

Since we hold that the tax scheme does not discriminate against interstate commerce, we consider whether the incidental burden imposed on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The legislature has determined that refuse reclamation facilities are a desirable part of its environmental scheme. Minn. Stat. § 115A.02.[6] The WLSSD facility specifically benefits the community by providing a consistent source of fuel for the sewage sludge incineration plant which, in turn, reduces pollution of the St. Louis River area, as well as providing a preferred method of waste disposal. The tax scheme makes these benefits possible by providing for the financial security of the facility, while at the same time providing an incentive to meet the state's goal of reducing waste. As a result of the combination of the tax and subsidy, the WLSSD facility may retain some business which otherwise would have shifted to out-of-state facilities. However, WLSSD's lowered tipping fee also draws business away from in-state waste disposal facilities. In any case, "[a] nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 474, 101 S.Ct. 715, 729, 66 L.Ed.2d 659 (1981). Granting that out-of-state businesses may be more heavily affected by the tax and subsidy scheme than in-state businesses by dint of the state's preference for incinerators (which are perhaps more costly) over landfills, this burden is not clearly excessive in light of WLSSD's substantial interest in ensuring the financial security of the waste facility and promoting waste reduction.

Furthermore, we conclude that there is no other financing option which would serve WLSSD's purposes with a "lesser impact on interstate activities." *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. We note that property taxes, the only other type of taxes which the WLSSD is authorized to impose, would have the same effect on interstate commerce as the waste generation tax, would be available for the same purposes, and would be levied on the same population (with the exception of tax-exempt entities). However, property taxes would not further the state's goals of reducing waste and encouraging recycling. Moreover, placing the entire cost of the facility on the tipping fee is not a viable option because it does not ensure the financial health of facility, nor would it serve the purpose of encouraging everyone in the district to reduce the volume of trash they produce.

As we hold that the tax is not discriminatory as a matter of law and that it poses only an incidental burden on interstate commerce, we remand to the lower court for further action consistent with these conclusions. Although our holding may not entirely dispose

---

**5.** Minnesota Statutes § 115A.02 furnishes the legislative statement of policy and purposes for the Waste Management Act. It provides in relevant part:

(a) It is the goal of this chapter to protect the state's land, air, water, and other natural resources and the public health by improving waste management in the state to serve the following purposes:

(1) reduction in the amount and toxicity of waste generated;

(2) separation and recovery of materials and energy from waste;

(3) reduction in indiscriminate dependence on disposal of waste;

(4) coordination of solid waste management among political subdivisions; and

(5) orderly and deliberate development and financial security of waste facilities including disposal facilities.

**6.** Minnesota Statutes § 115A.02(b), which lists waste management practices according to order of preference by the legislature, places resource recovery through incineration before land disposal.

of the waste management taxes held by WLSSD on the court's order, we note that the disposition should be controlled by the district court's findings as to the reasonableness of the tax and not by the outcome in the parties' separate federal proceeding.

In sum, we reiterate the importance of the state's initiatives to protect the environment by encouraging waste reduction, resource recovery, and recycling. The state has enacted a well-considered, comprehensive legislative scheme to meet these goals through solid waste management planning. Within the authority of this legislative scheme, the solid waste processing facility run by the WLSSD and the tax and subsidy scheme used to fund it accomplish the state's environmental objectives without discriminating against interstate commerce. WLSSD should be commended for its efforts and the tax should be regarded as a model for other communities.

Reversed and remanded.